IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| RYLAN NELSON, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | No. |
| | ) | |
| SOUTHERN NEW HAMPSHIRE MEDICAL CENTER (SNHMC), | ) | |
| | ) | |
| Defendant | ) | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff Rylan Nelson, through her undersigned counsel, Red Sneaker Law, PLLC, for her claims against Southern New Hampshire Medical Center, hereby alleges:

**PRELIMINARY STATEMENT**

1. This is a civil rights lawsuit brought, primarily, under the Americans with Disabilities Amended Act in order to ensure that Defendant provides effective communication to Deaf patients suffering from a mental health emergency, something Defendant failed to do, despite previous litigation with the United States Department of Justice involving Deaf patients, in this case.

## JURISDICTION

2. This Court has Federal Question Jurisdiction pursuant to 28 USC § 1331, as this action is based upon two important federal statutes: the Americans with Disabilities Act, Title II, 42 USC § 12131 *et. seq.* and Title III, 42 USC § 12181 *et. seq.* and the Rehabilitation Act, 29 USC §794, Section 504.

3. The Plaintiff requests that this Court exercise supplemental jurisdiction over the State court causes of action named herein as they arise from the common nucleus of operative facts. 28 USC § 1367.

## VENUE

4. Venue is proper in the United States District Court for the District of New Hampshire pursuant to 28 USC §1391(b) and (c) as the Defendant's medical facility is based in New Hampshire, Plaintiff was, at all relevant times, and is currently a New Hampshire resident and the core nucleus of operative facts occurred within this venue.

## JURY TRIAL DEMANDED

5. Plaintiff demands a trial by jury on each of the causes of action.

## PARTIES

6. Defendant Southern New Hampshire Medical Center (SNHMC) is a New Hampshire a New Hampshire nonprofit corporation located at 8 Prospect Street, Nashua, NH 03061. SNHMC is a "public accommodation" as defined in 42 U.S.C. §1281 (7)(F) and its implementing regulation, 28 C.F.R. §36.104, because it is a private entity that operates a place of public accommodation, specifically, a hospital. Further, upon information and belief, SNHMC receives federal funds.

7. Plaintiff Rylan Nelson is a profoundly, prelingually deaf patient of SNHMC and resided,

at all material times, at 114 Cimarron Drive, #8, Salem, NH 03074. Rylan Nelson is an individual with a disability within the meaning of the ADA, 42 U.S.C. §12102(1) and its implementing regulation at 28 C.F.R. Part 36 as Rylan Nelson is prelingually deaf and communicates, primarily, via American Sign Language, creating a limitation to one or more major life activities, she has a record of this impairment and the Defendant regarded her as having such an impairment. Further, Rylan Nelson, as she suffers from Post-Traumatic Stress Disorder, Depression, Anxiety and other mental illnesses, is an individual with a disability within the meaning of the ADA as her mental impairments substantially limit one or more major life activities, she has a record of such impairment and was regarded by Defendant has having such an impairment.

## FACTS

### STATEMENT OF FACTS AS TO RYLAN NELSON'S JANUARY 2019 ER VISIT

8. During a meeting at Greater Nashua Mental Health Center (GNMH) on January 17, 2019, Rylan's social worker, Holly Rioux, became concerned about a negative change in Rylan's affect and had Rylan transported to SNHMC via ambulance.

9. Holly Rioux works with GNMH's Deaf and Hard of Hearing Services, New Hampshire's primary source of mental health services for the Deaf and Hard of Hearing, as a social worker and is, herself, deaf and communicates primarily through American Sign Language (ASL).

10. SNHMC records show, that on January 17, 2019, SNHMC was aware that both Rylan Nelson and Holly Rioux were hearing impaired and used ASL as their primary form of communication.

11. Despite that knowledge, the medical record is devoid of any documentation of any effort, during Rylan's more than 15 hours at SNHMC, to obtain a live ASL interpreter.

12. Instead, SNHMC used, for a brief period, a computerized Virtual Remote Interpreting (VRI) system called Next Talk, similar to Zoom, it knew, as documented in Rylan's medical records, was ineffective.

13. The emergency room admission note states, "[w]e did try using the translator over the computer, but that was *ineffective* for the patient." (emphasis added)

14. The Next Talk system was ineffective because Rylan Nelson's mental health condition prevented her from moving so that she could see the computer monitor or so that the interpreter on the monitor could see her or as one of SNHMC's nurses put it in the medical record, "she does not want to sign high enough for the interpreter to see via laptop."

15. This is because, upon her admission, Rylan, according to the medical record, was in "full blown PTSD -dissociated from everything."

16. Rylan was unable to re-position herself because of her mental health condition, the very reason she was transported to SNHMC.  Under their "review of systems," SNHMC personnel noted "appears to be negative though the history and physical is somewhat suspected due to limitations in communications and the patient's mental status."

17. The limitation in communication was created by SNHMC's failures as described throughout this complaint.  After the single, brief attempt to use Next Talk, SNHMC personnel simply closed the laptop used for the program and made no further effort to use the system.

18. Rather than adjust the position of the laptop or get a live ASL interpreter, SNHMC personnel relied upon exchanging notes and used Rylan's social worker, who was not a licensed or qualified American Sign Language interpreter per RSA 326-I, to interpret.

19. Ms. Rioux repeatedly informed SNHMC personnel she could not act as an interpreter yet they continued to use her frequently asking that she "tell her (Rylan)…" one thing or another.

20. This continued until Ms. Rioux left, at which point, it was Rylan's understanding that, from that point on, her only choice for communication would be via written notes.

21. While, SNHMC personnel documented that Rylan agreed to note writing, there is no waiver of interpreting services in the medical record and none of the communication via writing between Rylan and SNHMC personnel has been preserved, including any note indicating Rylan agreed to use this form of communication.

22. This absence of the written exchange between Rylan and SNHMC personnel is all the more disturbing as it was the basis for discharging Rylan rather than admitting her, as was the determined to be the best course of action earlier in her treatment, to the Behavioral Health Unit of the hospital.

23. Roy Dewinkeleer, a member of SNHMC's mental health team, documented, instead of meeting and talking with Rylan about her condition, that "writer reviews handwritten notes written by client…" to make a determination Rylan could go home.

24. Based upon those undocumented writings, Rylan was discharged the morning of January 18, 2019.

25. Rylan denies having agreed to the use of note writing as she would be, without an

effective interpreter, unable to understand any communication with SNHMC personnel to a degree that would permit her to agree to such an arrangement.

26. Rylan's medical record from that January 2019 visit, contains:

   a. no documentation as to how it was initially determined Next Talk would be effective for communication,

   b. no documentation as to how it was determined written notes would be effective for communication,

   c. no documentation that a program administrator or other ADA compliance personnel was consulted in Rylan's treatment,

   d. no documentation that upon learning Rylan was en route via ambulance that any determination was made as to the most effective form communication for treating Rylan,

   e. no documentation of any inquires or attempts to obtain a live ASL interpreter or to determine if such an interpreter was needed even after documenting that Next Talk was ineffective,

   f. no documentation of any effort to move the Next Talk laptop into a position which would permit it's use by Rylan,

   g. no documentation that any reassessment of an the best auxiliary aide was made after the failure of the Next Talk, and

   h. no documentation that SNHMC made any accommodation whatsoever for Rylan's disabilities.

27. After the failures to provide effective communication described throughout this

complaint and upon her return home, Rylan formally complained to SNHMC about her treatment and the lack of communication.

28. The letter she received from SNHMC in response to her complaints stated that, after a review of the "translation" services, SNHMC determined the care Rylan Nelson received was appropriate while acknowledging "that communication was difficult." This despite the documentation, at the time of treatment, in the actual medical record that the communication was "ineffective."

## SNHMC'S PREVIOUS SETTLEMENT REGARDING DEAF PATIENTS

29. This is not SNHMC's first such documented failure to the Deaf Community.

30. The United States Department of Justice began investigating a complaint that SNHMC had failed to provide appropriate auxiliary aids and other services necessary for effective communication to another deaf patient in May of 2008.

31. That investigation resulted in a settlement agreement, D.J. No. 202-47-58, between the United States Department of Justice and SNHMC.

32. Most relevant to the present case, that agreement required SNHMC to:

   a. Establish two, or more, Program Administrators who would be available "24/7" to provide assistance in providing immediate access to appropriate auxiliary aides;

   b. Develop a form to document the determination process of deciding whether and what type of auxiliary aide would best ensure effective communication;

   c. Make a determination, based upon the specifics of the circumstances, as to the best type of auxiliary aide at the time SNHMC is aware someone requiring an auxiliary aide is en route to the hospital;

    d. Reassess any determination of the type of auxiliary aide upon indication that the aide currently in use is ineffective;

    e. Place such determination information in a patient's medical record;

    f. Provide qualified sign language interpreters for various aspects of a patients stay from intake to discharge;

    g. Make no fewer than five inquiries to provide a live interpreter while also informing the Program Administrator of the situation, notifying the patient of the effort and documenting all such efforts;

    h. Use video interpreting that allows patient and interpreter to see one another's heads, arms, hands, and fingers, *regardless of the position of the patient*. (emphasis added).

    i. Document a patient's inability to effectively communicate via video interpreting and then make all reasonable efforts to locale a live qualified interpreter or other effective auxiliary aide.

33. SNHMC, given the extent of the 2010 Settlement Agreement with the United States Department of Justice, is and was well aware of its responsibilities to deaf patients and that it had failed Rylan by providing "ineffective" communication.

## COMMUNICATION WITH THE DEAF

34. Studies by Gallaudet University, the University for the Deaf in Washington D.C., demonstrate the average reading level for an 18-year-old high school graduate, who happens to be deaf, hasn't changed much in the last 50 years, remaining stable between a third and fourth grade level.  To put that into context, the average

newspaper, online or otherwise, in the United States is written at an 11th grade level. The largest American Sign Language Dictionary holds some 5,600 words, while the Oxford English Dictionary has 500,000.

35. With that information, it is easy to see why it is so important to provide appropriate auxiliary aides to the Deaf and Hard-of-Hearing; without such aides, equal access is impossible. Even the average American, with an 8th grade reading level, has a difficult time understanding medical terminology. How much more difficult would the exchange of notes be with half the reading proficiency and a tenth the vocabulary?

36. While it may seem obvious, for a Deaf individual to communicate via American Sign Language, that Deaf individual must be able to see the person, live or virtually, with whom he is communicating as ASL is a visual language. Simply having an interpreter on a screen that cannot be seen by the Deaf individual or any system that does not permit the interpreter to see the Deaf patient is, as SNHMC itself noted, "ineffective."

**FURTHER ALLEGATIONS RELEVANT TO ALL CAUSES OF ACTION**

37. As described more fully above, Defendant's denial of effective communication during the medical treatment of Plaintiff caused Plaintiff significant pain, suffering, and emotional distress. Due to Defendant's refusal to provide effective communication, Plaintiff did not meaningfully understand critical information about diagnoses, prognoses, medication and/or treatment options. Plaintiff was also sent home from treatment at Defendant's facility without a complete or adequate understanding of the instructions for follow-up care or of her prognosis for future improvement, complications or relapse thereby causing significant emotional harm, anxiety and

confusion.

38. As described more fully above, Plaintiff, and her social worker, repeatedly put Defendant's staff on notice that communication was not effective by alerting them of the inadequacy of Next Talk systems and to their need for qualified ASL interpreters. Further the inadequacy, given the circumstances, of the Next Talk system was self-evident and documented as "ineffective" by Defendant. Yet, despite such notice, Defendant failed and/or refused to provide qualified onsite ASL interpreters, failed and/or refused to ensure that the Next Talk system was appropriate for the Plaintiff's circumstances, failed and/or refused to ensure that the Next Talk system was properly functioning, failed and/or refused to ensure that the Defendant's agents were properly trained and qualified in the use of the Next Talk system.

39. Rather, Defendant knowingly limited Plaintiff to the little communication Plaintiff could achieve through vague gestures, cryptic notes, and the few words Plaintiff could understand through reading lips. Defendant knowingly limited itself to the little communication it's personnel could understand from "yes and no" answers, alleged written exchanges and nonverbal responses putting the Plaintiff in medical jeopardy.

40. Given its 2010 settlement with the United States Department of Justice, Defendant is, and was, aware of its obligations under federal and state law to provide adequate and effective communication for the deaf and hearing and speech unintelligible individuals that visit its medical facilities as either patients or companions of patients.

41. Upon information and belief, Defendant refuses to hire qualified on-site sign language interpreters as a matter of policy at its hospital and other facilities and

insists upon communication through such inadequate means of communication as handwritten notes, gestures, lip reading, and/or Next Talk whether those methods are effective or not.

42. Upon information and belief, the refusal to offer on-site sign language interpreter services to the Plaintiff is the result of a policy or practice of Defendant to discourage the use of onsite interpreters without regard to whether its Next Talk service or other methods of communication will provide effective communication, are available or even in working conditions.

43. Per RSA 326-I, reliance by deaf and hearing and speech impaired individuals upon other deaf individuals to interpret medical communications for them is unwise, dangerous and illegal. Such other individuals, even social workers, are, as here, not trained to act as interpreters, particularly in medical and hospital settings. Such individuals, as here, often are untrained in accurately and precisely interpreting and conveying for and to the hearing-impaired individual the complete and accurate content of medical communications.

44. As a result of Defendant's failure to ensure effective communication with Plaintiff, Plaintiff received care and service that was objectively substandard and that is inferior to care provided to patients who can hear.

45. Furthermore, despite its knowledge and understanding of its legal obligations to provide adequate and effective communication to the Plaintiff, and its knowledge and understanding that the failure to provide adequate and effective communication to Plaintiff could and would result in denial of the Plaintiff's rights under law and in serious and material harm and injury to the Plaintiff, Defendant knowingly,

intentionally and maliciously failed and/or refused to provide adequate and effective communication to Plaintiff in an intentional and/or deliberately indifferent violation of Plaintiff's rights.

46. It is reasonably foreseeable that Plaintiff will continue to visit one or more of Defendant's facilities, either by choice or necessity, due to the ubiquity of Defendant's facilities and the proximity of those facilities to Plaintiff's homes and the location of Plaintiff's mental health treatment team. It is also reasonably foreseeable that other Deaf individuals will require emergency mental health treatment at Defendant's facilities given both New Hampshire's mental health crisis and the proximity of New Hampshire's primary mental health provider for the Deaf.

47. Based on the foregoing, on information and belief, the actions and omissions of Defendant resulting in harms to Plaintiff were willful, malicious, intentional, recklessly indifferent and undertaken with an evil mind and motive and with disregard for and deliberate indifference to the legal rights of Plaintiff under federal and state law and the substantial risk of serious and material harms to the Plaintiff. Therefore, to the extent allowed by any applicable law, Defendant's actions would warrant, in addition to all other appropriate relief, the imposition of punitive, exemplary damages, or enhanced compensatory damages to punish the Defendant for its wrongful conduct and to deter other similarly situated persons or entities from similar future conduct.

## FEDERAL CLAIMS

## COUNT I

## DEFENDANT SNHMC VIOLATED TITLE III OF THE ADA

48. Plaintiff re-alleges and incorporates by reference the allegations of facts contained in every preceding paragraph.

49. Plaintiff, as described above, is substantially limited in the major life activities of hearing. Further, Plaintiff was regarded by Defendant as person with a disability and had a record of disability. Accordingly, she is an individual with a disability as defined under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12102(2).

50. Plaintiff, as described above, is substantially limited in major life activities by her mental illness. Further, Plaintiff was regarded by Defendant as person with a mental health disability and had a record of mental health disability. Accordingly, she is an individual with a disability as defined under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12102(2).

51. Defendant owns, leases, and/or operates a place of public accommodation as defined under Title III of the ADA, 42 U.S.C. § 12181(7)(F). Title III of the ADA prohibits discrimination on the basis of disability "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodations . . ." 42 U.S.C. § 12182(a).

52. Pursuant to Title III of the ADA and its implementing regulations, a public accommodation cannot deny participation or offer unequal or separate benefit to individuals with disabilities. 42 U.S.C. § 12182(b)(1)(A); 28 C.F.R. §§ 36.202.

53. Pursuant to Title III of the ADA and its implementing regulations, a public

accommodation shall furnish *appropriate* auxiliary aids and services to ensure *effective* communication with individual with disabilities. 42 U.S.C. § 12182(b)(2)(A)(iii); 28 C.F.R. §36.303(b)(1).  (emphasis added)

54. Pursuant to Title III of the ADA and its implementing regulations, a public accommodation, in choosing the type of auxiliary aid or service to ensure effective communication, must consider the "method of communication used by the individual; the nature, length, and complexity of the communication involved; and the *context* in which the communication is taking place." 28 C.F.R. § 36.303(c)(1)(ii). (emphasis added)

55. Pursuant to Title III of the ADA and its implementing regulations, in order to be effective, the type of auxiliary aid or service provided by the public accommodations "must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability." 28 C.F.R. § 36.303(c)(1)(ii).

56. Pursuant to Title III of the ADA and its implementing regulations, when a public accommodation provides VRI service, it must ensure that the service includes all the following  criteria: "(1) [r]eal-time, full-motion video and audio over a dedicated high-speed, wide bandwidth video connection or wireless connection that delivers high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication; (2) [a] sharply delineated image that is large enough to display the interpreter´s face, arms, hands, and fingers, and the participating individual´s face, arms, hands, and fingers, regardless of his orher body position; (3) [a] clear, audible transmission of voices; and (4) [a]dequate training to

users of the technology and other involved individuals so that they may quickly and efficiently set up and operate the VRI." 28 C.F.R. § 36.303(f). Most importantly, the disabled patient using the VRI must be able to see the interpreter.

57. Defendant discriminated against the Plaintiff on the basis of her disabilities by denying access to full and equal enjoyment of the goods, services, facilities, privileges, advantages, and/or accommodations of their place of public accommodation and equal opportunity to participate in and benefit from Defendant's health care services in violation of 42 U.S.C. §§ 12181, et seq. by using a VRI device Plaintiff, due to the conflux of her disabilities, was unable to use.

58. Defendant discriminated against the Plaintiff by failing to ensure effective communication through the provision of qualified in-person interpreters. On information and belief, the refusal to offer in-person interpreter services is as a result of a policy or practice of Defendant to discourage the use of in-person interpreters without regard to whether VRI services will provide effective communication and no matter the risk to patient care.

59. As a proximate result of Defendant's discrimination, actions and inactions, Plaintiff suffered harm as set out above.

## COUNT II

## DEFENDANT SNMC VIOLATED SECTION 504 OF THE REHABILITATION ACT

60. Plaintiff re-alleges and incorporates by reference the allegations of facts contained inevery preceding paragraph.

61. Plaintiff is substantially limited in the major life activities of hearing. Further, Plaintiff is substantially limited in her major life activities do to the nature of her mental

disability described above and throughout this complaint. Accordingly, she is an individual with a disability as defined underSection 504, as amended, 29 U.S.C. § 708(20)(B).

62. During all relevant times, Defendant was and continues to be a recipient of federal financial assistance, including but not limited to its acceptance of Medicare and Medicaid.

63. Pursuant to section 504, "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be exclude from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ." 29 U.S.C. § 794.

64. Defendant has discriminated and continues to discriminate against Plaintiff solely on the basis of her disabilities by denying her meaningful access to the services, programs, and benefits the Defendant offers to other individuals by refusing to provide auxiliary aids and services necessary to ensure effective communication in violation of Section 504 of the Rehabilitation Act. 29 U.S.C. § 794.

65. Defendant discriminated against the Plaintiff by failing to ensure effective communication through the provision of qualified in-person interpreters.

66. Defendant has discriminated and continues to discriminate against Plaintiff solely on the basis of her disabilities by denying her meaningful access to the services, programs, and benefits the Defendant offers to other individuals by refusing to provide auxiliary aids andservices necessary to ensure effective communication in violation of Section 504 of the Rehabilitation Act. 29 U.S.C. § 794.

67. As a result of Defendant's failure to ensure effective communication, the Plaintiff

has suffered and will continue to suffer mental anguish, fear, isolation, suffering, embarrassment, and humiliation.

68. As a proximate result of Defendant's discrimination, actions and inactions, Plaintiffsuffered harm as set out above.

## STATE LAW CLAIM

## COUNT III

## DEFENDANT SNHMC VIOLATED RSA 354-A

69. Plaintiff re-alleges and incorporates by reference the allegations of facts contained inevery preceding paragraph.

70. Plaintiff, as described above and throughout this complaint, is a person with a disability as defined by New Hampshire RSA 354-A.

71. Defendant owns, leases, or operates a place of public accommodation as defined underNew Hampshire RSA 354-A.

72. New Hampshire RSA 354-A:16 provides that "The opportunity for every individual to have equal access to places of public accommodation without discrimination because of age, sex,gender identity, race, creed, color, marital status, physical or mental disability or national origin is hereby recognized and declared to be a civil right."

73. Further, New Hampshire RSA 354-A:17 states, "It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, because of the age, sex, gender identity, race, creed, color, marital status, physical or mental disability or national origin of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof; or,

directly or indirectly, to publish, circulate, issue, display, post or mail any written or printed communication, notice or advertisement to the effect that any of the accommodations, advantages, facilities and privileges of any such place shall be refused, withheld from or denied to any person on account of age, sex, gender identity, race, creed, color, marital status, physical or mental disability or national origin; or that the patronage or custom there at of any person belonging to or purporting to be of any particular age, sex, gender identity, race, creed, color, marital status, physical or mental disability or national origins unwelcome, objectionable or acceptable, desired or solicited."

74. Defendant discriminated against the Plaintiff as set out above by denying her equal access to the services, programs, and benefits by refusing to provide auxiliary aids and services necessary to ensure effective communication in violation of New Hampshire RSA 354-A:17. As described above, it is likely that the discrimination will recur.

75. As a proximate result of Defendant's discrimination, actions and inactions, Plaintiff suffered harm as set out above.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff respectfully prays that this Court grant the following relief against the Defendants:

A. Enter a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that Defendants' practices, policies and procedures have subjected Plaintiffs to discrimination in violation of Title III of the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act of 1973;

B. Permanently enjoin Defendant from any practice, policy and/or procedure which will deny Plaintiff equal access to, and benefit from Defendant's services or which deny Plaintiff s effective communication with Defendant. This includes entering a permanent injunction ordering Defendant:

   1. To cease discrimination against Plaintiff and other Deaf or Hard-of-Hearing patients and their families;

   2. To promulgate and comply with policies and procedures to ensure that Defendant and its staff do not discriminate against individuals whoare deaf and hard of hearing;

   3. To promulgate and comply with procedures to ensure that Defendant will provide and pay for interpreter services when needed by individuals who are deaf or hard of hearing in all services offered by Defendant;

   4. To promulgate and comply with procedures to ensure that Defendant will notify individuals who are deaf or hard of hearing of their right to effective communication. This notification will include posting explicit and clearly worded notices that state that the Defendant will provide sign language interpreters, TTYs and/or other communication services to ensure effective communication with deaf or hard of hearing persons;

C. Schedule a trial by jury;

D. Enter a judgment in favor of Plaintiff awarding any and all relief available under law to the maximum extent allowed by common law, state and federal statutes, and the Constitutions of New Hampshire and the United States of America, including but not limited to the following:

   1. Compensatory damages;

   2. Enhanced Compensatory damages;

   3. Punitive damages;

    4.  Reasonable costs, interest and attorneys' fees; and,

E.  Award any and all other relief that may be just, necessary and appropriate.

        Respectfully submitted,

        Rylan Nelson

        By her attorney,

        RED SNEAKER LAW, PLLC.

Dated: January 12, 2022    By:*/s/* Kirk C. Simoneau (#19291)   46 Technology Way, Suite 2W7A
Nashua, NH 03060
(603) 336-2028
*kirk@redsneakerlaw.com*